Good morning. May it please the Court. My name is Norton Tooby. I'm representing Appellant Johnny Barnes on this 2254 habeas matter. I'd like to reserve four minutes for rebuttal, if I may. I'd like to focus mostly on the jury misconduct that occurred when the single juror who felt strongly that this was no more than manslaughter went home one evening and had three improper conversations during which he asked for advice. Should I continue to follow my conscience or should I abandon my conscientiously held belief this is only manslaughter and go along with the majority? That was the essence of the case. He went to a friend's house and he told the friend about the facts of the case and asked that question. He asked the friend for advice. And when another friend called him later on that evening on the telephone, he had a similar conversation. So can you give me the chronology, too, in terms of apparently in the state opinions it says something about the fact that he was already changing before he had some conversations, exactly what the evidence shows on that? Yes. The jury deliberated nearly five full days before finally returning the verdict. The first four of those days, Juror Allman held out steadfastly his belief that this was no more than manslaughter. On the afternoon of the fourth day, the other jurors stopped. They were going to report him at some point, weren't they? They stopped what I would call true deliberations, applying the law to the facts, and they started talking about how they could get Allman off the jury. I suggest that leads to an inference that they thought they were deadlocked, that further true deliberations would not produce the verdict. So they took a statement that Allman had made about the cost of incarceration for life, and they reported it to the judge in the hope that the judge would disqualify Allman from the jury. And the judge returned an instruction saying don't consider that matter, and that was it. And so that effort to disqualify him had failed. And the Court of Appeals pointed out that after that had happened, Juror Allman, according to the three juror declarations, was uncharacteristically quiet. The Court of Appeals, in finding the presumption of prejudice to be rebutted in this case, relied on two facts. This is the first fact. They said that the fact that he was uncharacteristically quiet in the afternoon of the night led to the inference that he was perhaps beginning the process of changing his mind, and since he was beginning the process of changing his mind prior to the evening improper communications, that that rebutted the presumption that when his friend said hang him and berated juries for cutting violent people based on technicalities and mental defenses, all that improper communications was harmless because he was already beginning to change his mind before that improper... I had trouble seeing why that was unreasonable. It seemed to me that what the California Court of Appeal was doing there, it was the exercise they have to perform under California law. It's different from most states' law and Federal law and that. Most states and Federal, you don't care, you don't want to hear what went on in the jury room. California, they examine it. But even with that, we have a case out called Seahawk Seafoods, where we, it was one of the Exxon Valdez cases, and we carefully examined what improper conduct with respect to juries and found that the authorities distinguished extraneous information or extrinsic evidence cases where the burden is on the party opposing a new trial to demonstrate the absence of prejudice. We distinguished them from ex-party contacts cases where the defendant gets a new trial only if the party seeking the new trial shows actual prejudice. And the reason for that is the fact that in trials of any length, there are always ex-party contacts. It's just a question of whether you find out about them. And this looks to me like it's a pure ex-party contact case, not an extrinsic evidence case. And it doesn't look like any big deal. I mean, what he hears is what all of us have heard on the radio for 30 years about technicalities, letting criminals go and this sort of thing. And big deal Well, Your Honor, I think there's, I think the Court of Appeals was unreasonable in saying that because he was quiet the previous afternoon, that rebuts the inference of the prejudice from the improper contact that night because If you argue vociferously, if the choice is between A and B, you argue vociferously for A, for hours and hours, and then somebody says something and you sort of quit arguing for a while. And the discussion goes on without you. One possibility is you figure, waste of time talking to these people. Another possibility is, gee, you know, I'm not so sure of myself anymore. And they're drawing the second inference. Right. But even if you draw that inference that he's beginning to reassess, you know, the law is full of multiple causative effects, joint and several liability, concurrent causes, cumulative error. I think the Court of Appeals was That's great for extrinsic evidence, but not good enough for ex parte contact. Well, no, I don't think that's correct, Your Honor. What we have here clearly shows actual prejudice, because it's not inconsistent between the beginning of a reassessment and then he goes home and he gets a kick in the pants. He's told hang him. Why would he have solicited these opinions from people who were going to tell him to hang him, unless he's already looking for some reinforcement for changing his point of view? Well, no, I think he was asking a genuine question. He said, should I continue to hold to my conscientious belief that this is manslaughter, or should I follow the majority? I think the reason I think it's impossible As I know what my conscientious belief is, I'm not likely to ask people whether I should hold on to it. It's if I don't know, if I'm shaky, if I'm changing, I'm not likely to ask. We know he did ask that question. That's clear. He's already moving away from his conscientious belief. Right, but he had not, if he had already decided to change his vote, why would he ask for advice? He wouldn't. That would be totally unreasonable. That would be totally unreasonable to interpret the record that he had already decided 100% to change his vote before he went home that night, because why would he ask for advice? Social reinforcement. Yeah, you're doing the right thing. All we know is that he refused for four days to go along with the majority, and that he did not go along with the majority. He went home and he asked for advice. That was improper. Should I abandon my conscience? That's improper. The judge told him, the unanimity requirement, the defendant is entitled to unanimous, honest opinions of all 12 jurors. You may not simply follow the majority. So he asked for advice whether he should violate the court's instructions, and he got advice from three different people. And these aren't just people like the bartender or the restaurant guy who was presumed in Stockton v. Virginia to be somewhat influential. These are people that he loved and trusted. Their opinion is important to him. Far more important, a wife, best friend, than other jurors that he had never met before. So I think even if he might, we don't know that he started to reassess his position. That's a guess. But even if that's true, that doesn't mean he had completed the process. If he was, if the three votes for guilty that he presumably got from his wife and two friends influenced him, and we have to assume that they were influential or he would not ask for their advice. I don't think that's a reasonable assumption. I'm thinking suppose you take it out of this particular case's context to just look at this one factor that you're raising, this assumption. Suppose somebody changes political affiliations from Republican to Democrat or from Democrat to Republican. He's likely to feel very uncomfortable about it because he feels like he's betraying his former beliefs or his former associates. He's probably going to seek out a bunch of people to pat him on the back and tell him he's doing the right thing. Well, Your Honor, that's, I think the presumption here is that there was prejudice from these improper statements. Oh, there isn't. That's what the distinction between extrinsic evidence and ex parte context is all about. There's no presumption. Well, Your Honor, I disagree with that, but even if you're correct, I believe that the showing here is very clear that there was actual prejudice. Let's say I'm not. That just means I'm missing some authority, which is entirely possible in a lot of cases. What Supreme Court authority did the state court act contrary to or apply in a clearly unreasonable way with regard to ex parte context? Well, Your Honor, this is, Maddox is the original case. And then it was, I believe it was Remmer that we discussed in some length. And Remmer is the one that says that there is a presumption of prejudice from improper context. Your Honor, the Ninth Circuit is very clear on that. The Caliendo. Remmer said that an ex parte communication is, requires a new trial if it creates a reasonable probability of prejudice. Your Honor, I thought it was any, here's the quote I have from Remmer at page 229. Any private communication, contact or tampering directly or indirectly with a juror during a trial about the matter pending before the jury, unquote, is deemed, quote, presumptively prejudicial and placed a heavy burden on the government to rebut the presumption by proving that the error was harmless beyond a reasonable doubt. So I think the presumption of prejudice clearly applies under the United States Supreme Court authority in Remmer. But here, Your Honor, we have a situation where he goes home and he asks for advice, and he gets the advice. Hang him. Don't let this guy loose on a technicality. There's four or five jurors are berated who turn people loose on technicalities that you've got to convict because he might kill again. You've got to vote with the majority. You have no right to go against the community standards as represented by the majority. That's friend number one. Friend number two says you've got to convict. Defendants overuse mental defenses to justify murder. This goes to the heart of the mental defense that was Mr. Barnes' mental defense in this case. This is a close case. Under every standard of is a case close or not, this is clearly a close case. The deliberations went on for nearly five days. There were 11 jury questions. Including a question of a readback of the defense psychiatrist on the mental defense issue. The jury refused to convict, refused to find true the robbery murder special circumstance that was the focus of the state's theory of the case, that Johnny Barnes went there to rob. Then they refused to return that, and that's a mark of a close case. There was conflicting expert evidence. Well, there wasn't. The defense presented expert evidence that was unrebutted. I think that special, that doesn't really help you because this is his dad and his stepmother, and any, you know, I mean, any time you kill people in your family, I think most people assume it's, yeah, there might be some money involved, but it doesn't fall into your classic home invasion. You know, I mean, most of the, you know, I'm mad at my kids. They haven't, they've cost me much too much money, but, you know, I can't really claim it's robbery. I agree, Your Honor, but here it shows the jury was not just going along with everything the prosecution wanted. Oh, right. I mean, usually when you kill two people, you get the death penalty, but when you kill your family, you know, most people figure that family's got some complicity in the situation. So every single hallmark of a close case is present here, and as the court knows, when a case is close, an error is more likely to be found prejudicial. It's just common sense. I think that where the juror goes home and asks for advice and gets the advice and follows the advice, the very next day, on the very next vote, that the prejudice is closed because it's clearly shown here. That seems so unreasonable to me. I mean, very often you ask for advice, you ask for somebody to tell you to do what you want to do anyway, and you're very emphatic on that, and I think your strongest point was really about Remer and Maddox rather than what you seem to think is the common sense of advice. On the Remer and Maddox issue, which I think is your strongest point, I'm wondering whether what the Supreme Court did in the case of Remer and Maddox was that in Ruchin v. Spain and Smith v. Phillips, both of them, their ex-party contacts and the court held that the defendant would then have the opportunity to prove that there was some harm or it could be harmless error. And I'm wondering if that muddied up Remer and Maddox enough so that you can't say that the California Court of Appeal acted contrary to it or unreasonably applied it. I think that's a very good question. I think the distinction between Ruchin and our case is that in Ruchin, the judge brought all the jurors in and questioned them and observed their demeanor and made a factual finding of no prejudice, and because of the testimony and the demeanor, deference to the factual finding of the trial judge was appropriate, and that was the key factor in Ruchin. Now, in the present case, we do not have that. We have a situation where the historical facts concerning the juror misconduct are uncontroverted, and the law in the Ninth Circuit, Marino v. Vasquez at page 504, says that where the historical facts are uncontroverted and what is in dispute is the state appellate court's conclusion, legal conclusion, about prejudice or not. They said, quote, the application of a legal standard to historical facts does not constitute a factual finding entitled to a presumption of correctness under 2254D. So all of the cases, Ninth Circuit cases that followed Ruchin, Marino v. Vasquez, Lolicio v. Gourd, and Lawson v. Borg followed Ruchin were cases just like this one where the question, where the historical facts were uncontroverted about the jury misconduct, and Ruchin was inapplicable, and they applied, they said we do not defer to the court of appeals' legal conclusion of no prejudice that was based on uncontroverted historical facts about the juror misconduct. The ‑‑ I think, you know, Your Honor, the main unreasonability, the central heart of the unreasonability about the court of appeals' decision is that they assumed that there was one cause and one cause only of the change of mind, and that flies out of the court of appeals, and it flies in the face of human experience. Let's say he was beginning to rethink his position, but he had not made up his mind yet whether he was going to hang in there or change. And then he goes home, and the three people say hang him. I know that's a little overstated, but one of them said hang him, and the others said convict in various ways. And then he comes ‑‑ and that pushes him further, and then the next day, he goes home, and the three people say hang him, and the jury spends the entire morning not engaging in true deliberations anymore. They're trying to kick him off the jury again. They spend three full hours ‑‑ You wanted to reserve some time for the following. Yes, I'm sorry. Okay. We already heard this part of the argument. They ‑‑ I think it's unreasonable to assume that he changed his mind, and then the jury spent all this time the fifth day before they got a verdict. So I would reserve the rest of my time. Thank you. Thank you. Thank you, counsel. Thank you. May it please the court, Alan Yano, deputy attorney general representing respondent. I just want to hit the gist of this case. This is a case law from the Ninth Circuit that draws the distinction that Judge Kleinfeld made, the distinction between ex‑party conversations and ex‑party contacts and the various other types of contacts. But what I also want to point out is that this case is not le caliendo because it does not involve contact with an interested party and doesn't involve contact with a witness. It is, as I believe more than one member of this court pointed out, involves external contacts with people who were not related to the case. I think the case falls squarely under the Dutkill presumption. The Dutkill lack of presumption, I should say. The what? United States v. Dutkill. It was cited in our briefs. Dutkill is also cited in the district court's opinion as well as United States v. Madrid. And the various cases to talk about have been cited either in the briefs or in the excerpts of record. The other point I would like to make is that there are a couple of issues here, and this ‑‑ and I think there's a distinction that needs to be kept in place. And that is the distinction between the juror's subjective thought processes and the objective facts that we use to discern normally. Even in California, we're not supposed to look at the subjective thought process. That's right. And if ‑‑ your Honor asked a question about the chronology of what had occurred here. And my concern was that this would be leading to a question of an examination of the juror's subjective thought processes. Well, yeah, I think the objective things would be like the foreperson going to him and saying, we're going to report you. And we're going to report you to the judge. And then you get a note or whatever from the jurors, or you get a note from the foreperson saying, juror number eight made the following comment. I think those are all things that were said. But you kind of have to look at is that conduct or is that how they're thinking? Well, it's a subjective fact, as your Honor pointed out. And so ‑‑ but the point is that if you are going to look at the subjective factors, then we have ‑‑ we're dealing here with state court findings. Counsel, with all due respect to counsel, he made an excellent state court argument. But we're not in state court. We're governed by the ADPA, and we're governed by the constitutional standard. And in the absence of the presumption, we're governed by the Breff v. Abraham standard, which is that he has to show that ‑‑ Could you talk about how the Supreme Court authorities are now with respect to the presumption? All right. My understanding is that the Supreme Court authorities ‑‑ Which cases do you think need to be looked at, and what is Supreme Court law right now on ex‑party contacts? All right. Ex‑party contacts? Well, I think that ex‑party contacts that do not involve jury tampering and that do not involve ‑‑ that do not involve jury tampering and do not involve contacts with witnesses or interested parties would probably be governed ‑‑ I would initially say that it would be governed by Smith v. Phillips, and it would also be governed by Russian v. Spain. But what ‑‑ there is ‑‑ I think there is an open issue after the passage of the ADPA, because I don't think the Supreme Court has ever clearly come out and said how the Breff standard and the ADPA affect the application of these presumptions. There is ‑‑ I believe that there are cases from the lower courts that have raised some questions about how the presumption applies and whether it applies. But I don't think that there is clearly established federal law that tells you how we apply Breff and the ADPA to these jury ‑‑ to these jury misconduct cases, certainly of the type that are here. My thought on the logic is it's kind of tricky. Breff is the rule. However, in order to read ‑‑ to follow or reasonably apply or not act contrary to Supreme Court authority, the state court has to follow what the Supreme Court says is a presumption arising from the Constitution. See, that's ‑‑ the question that I have is how much of this presumption arises from the Constitution, because when we look at the cases where the presumption arose, Maddox, Rever, they were all federal criminal cases. The United States was a party to all those cases. So I think that if we start ‑‑ I realize that there is authority from this court that has to follow, but I'm not sure that those cases have really considered ‑‑ have really spoken and clearly addressed the fact that those are ‑‑ those cases arose in a federal criminal context. In terms of a ‑‑ see, the problem I would have with a presumption arising from the Constitution is that normally the Constitution, with a certain exceptions, doesn't talk about rules of evidence and distributions of burdens of proof other than the basic find it beyond reasonable doubt. And so it doesn't talk about the ‑‑ it doesn't generally talk about the mechanics of how a state court is to view during this conduct. And that's the problem I have with assuming that there's a flat‑out presumption, because the lower courts seem to be assuming that there is, but when you look at the Supreme Court cases, they don't come right out and say that. And if you look at the ‑‑ at the context in which the presumption would arise, it's very ‑‑ it's questionable as to how this could arise from the Constitution, because that's not something the Constitution normally deals with. So that would ‑‑ that would be the problem that I would have with assuming that there's this presumption. I just have some very ‑‑ I just have some questions about whether the cases that say that there is this constitutional presumption are really correct. I think this point has to be looked at again, because it's doubtful in my mind that there is a presumption. Let's say, just for the sake of discussion, that Remmer is what the state court was obligated to follow. Would you then say that it did not unreasonably apply Remmer or act contrary to it? Right. Actually, see, what I ‑‑ they apply the presumption. They refer to the presumption. But what I see is that he's rebutted this ‑‑ he's rebutted the state ‑‑ It's hard for me to follow your argument when you're basically arguing with your adversary instead of responding to my question. Okay. Sorry. What I see is this. I see this really being more of a clear and convincing evidence, rebutting the state findings by clear and convincing evidence. And that strikes me as what the core issue is here. I don't see this as being a case in which he can make a tenable argument that the state court misapplied Remmer or any of the cases that he claims the state court misapplied. I think what he is ‑‑ he has to base his argument on a clear ‑‑ that he's rebutted the state court's findings by clear and convincing evidence. And he cannot do that, and I don't think he can do that based ‑‑ if he looks at it from the terms of the subjective role of the juror's thought processes, which to my mind is very questionable whether that's the appropriate way to go, or from the ‑‑ and certainly he cannot go, he cannot make this showing based on the objective aspects of the ‑‑ of what was said. Because when we look at what was said, it's basically, as members of this court pointed out, it's the kind of thing we hear all the time. And it's also something that comes from a source that is not an interested party and is not a witness. And therefore, there's no presumption, assuming that there would ever be a presumption. The other point, he also mentioned Marino. I would point out that Marino is a pre‑ADPA case. The standard for review was different then. It doesn't really apply now. Finally, there was one point that he raised in his brief that he did not raise in the oral argument that I do want to address. And that is, he argued that under 1150, my argument ‑‑ our argument was that under evidence code 1150, the state court found that everything in the declarations was inadmissible. That wasn't my point. My point was that there's a real problem with accepting this declaration at face value, because there's a fair amount of evidence in the state court and a fair amount of hearsay in it. The hearsay is not the recorded statements of the ‑‑ it's not the reported statements themselves, but it's the fact that it came in through a declaration rather than through testimony. Now, the state court could permissibly conclude that when the juror said that he contacted other people, that was inadmissible, because that was a declaration against interest. But the district ‑‑ but the state court never came out and said specifically what parts of his declaration were true and what parts were not true. They sort of assumed that it was true. And they found that the ‑‑ and they found that he had not made out a case even assuming that it was true. They didn't say assuming argument it was true, but the fact is they never clearly said that we're finding it true. And the fact is this came in only through the declaration. The court of appeal would have had substantial reason to question just how valid these statements were for two reasons. And one is that the juror says that he was drunk and he talked about the case. And then he drank some more and he talked about the case. And then somehow he comes in and he's able to remember this clearly the next day, when, as the court of appeal noted, the other jurors didn't notice any signs of intoxication, even though ‑‑ But should they be waned? I mean, in the lower court, it basically ‑‑ that was accepted as those were the facts, right? Well, that's my point. My point is that I ‑‑ we can't really say that, because the court seems to ‑‑ the court seems to say these are the allegations, and then they said something about, well, the declarations show that he talked to someone and he came into the jury room the next day. It's not really clear from the opinion that they really found everything that he said to be true. The other point that I do want to make about that is that this is a juror who was the holdout juror, and he had a reason to attack the verdict. We don't know if he was making this up out of whole cloth or if he was exaggerating or whether it was all ultimately true. The fact is the court of appeal did not specifically come out and say ‑‑ I'm a little bit confused. Are you asking us to engage in that process? No, I'm not. What I'm saying is that this is ‑‑ my opponent's argument is based on the assumption that everything is true. And what I'm saying is that the court of appeal did not find it true, and I don't think that this court did not specifically find that it was all true. They suggested that what they found to be true was only the fact that he had the conversations and came back. And what I would suggest to this court is that this court rely on the court of appeals statements that the ‑‑ what would happen was that he talked to other people and then came back to the jury room. But I don't ‑‑ I think that this court would be reading more into the opinion than is really there if it assumes that everything that was in the case was true. Unless the court has questions, I would submit it. Thank you, counsel. We'll hold you strictly to one minute. You have less than that left. Our arguments are based on the facts as found in the court of appeals decision. We're basing our facts on the court of appeals statement of facts. I don't see ‑‑ there were three declarations, one from the holdout, two from convicting jurors, all consistent. The U.S. Supreme Court authorities are opening brief page 22. The fact that these are constitutional issues is the law of this circuit under the Caliendo decision, which was a 2254 case. I would just say that the court of appeals is unreasonable in assigning zero causative evidence to the court of appeals. It's unreasonable in assigning zero causative effect to these three improper hang him, don't let him off on a technicality, convict him, all this contamination, all this push in an illegal direction that happened the night before. The idea that that's going to have zero effect is totally unreasonable. The only reasonable conclusion is that the juror was feeling the effect of all of these different forces, including the illegal forces. And there is certainly a risk that the illegal forces that are conceded by the court of appeals had a substantial and injurious effect in causing him to change his vote the very next day, the very next vote. Thank you. Thank you, counsel. Thank you, counsel. Thank you, counsel. Thank you, counsel.
judges: Oakes , Kleinfeld, Callahan